In the Matter of the Hearing on Motion of the Commission, as to the Alterations and Changes in the Crossing at Grade of Bay Street, Clifton, in the Borough of Richmond, with the Tracks of THE STATEN ISLAND RAPID TRANSIT RAILWAY COMPANY. THE STATEN ISLAND RAILWAY COMPANY and Another, Appellants; TRANSIT COMMISSION OF THE STATE OF NEW YORK, Respondent.

In the Matter of the Hearing on Motion of the Commission, on the Question of Alterations and Changes in the Following Grade Crossings with the Tracks of THE STATEN ISLAND RAPID TRANSIT RAILWAY COMPANY: Belair Road, Hope Avenue and Tompkins Avenue, in the Borough of Richmond.

THE STATEN ISLAND RAPID TRANSIT RAILWAY COMPANY, Appellant; TRANSIT COMMISSION OF THE STATE OF NEW YORK, Respondent.

Second Department, March 18, 1927.

Railroads — grade crossing elimination, Staten Island — appeal from orders of Transit Commission ordering elimination of certain crossings — Appellate Division will not pass on facts except to determine if they fairly warrant conclusion of Transit Commission — neither light street traffic nor infrequency of accidents controlling in determining whether public safety demands elimination — train movement is to be given weight — no precise rule can be stated as to when public safety demands elimination of particular grade crossing — facts in relation to grade crossings in question justify order for elimination — orders to eliminate do not violate constitutional rights of railroad or Interstate Commerce Act, § 1, ¶¶ 18 and 21, § 15-a or § 20-a — police power of State to eliminate grade crossings is not subordinate to power of Interstate Commerce Commission over interstate railroads.

This is an appeal from two orders of the Transit Commission directing the elimination of grade crossings on Staten Island. The Appellate Division will not pass upon the facts except to determine if they fairly warrant the conclusion of the Transit Commission that in the interest of public safety it is necessary that the grade crossings be eliminated.

It is impossible to lay down a specific rule applicable to all cases involving the elimination of grade crossings, but each case must be determined in the light of the circumstances and conditions surrounding the particular crossing. The fact that the street traffic over the crossings is comparatively light and that in the past twenty years only a few accidents have occurred at the crossings is not necessarily controlling on the question as to whether public safety demands their elimination. While those facts are to be given consideration, the extent of the train movement over the crossings is entitled to considerable weight.

In the present proceedings it appears that at one crossing during a period of twelve hours from morning until evening, 1,774 pedestrians and 1,959 auto-

mobiles passed over the crossing, while the train movement during the same period over that crossing amounted to 226 trains and engines. As to the other crossings, the street traffic was not extensive, but it appears that 88 trains passed over those crossings during a period of twelve hours. The crossings were very well protected by gates and watchmen and there have been only a few accidents on the crossings within the last twenty years. The facts surrounding the crossings warranted the conclusion of the Transit Commission that it was in the interest of public safety that they be eliminated.

The contention by the railroad that the orders made by the Transit Commission deprive it of its property without due process of law in violation of the Federal and State Constitutions in that the direction to remove the crossings is arbitrary and unreasonable and that the expense thereof will bankrupt the railroad is without force. The Transit Commission has the power to make the orders if the facts justify them without regard to the effect thereof upon the financial condition of the railroad.

The railroad cannot rely upon paragraph 18 of, section 1 of the Interstate Commerce Act which provides that no interstate railroad shall abandon all or any portion of its line without the consent of the Interstate Commerce Commission. The railroad's theory is that if the orders made are carried out it will become bankrupt and, therefore, will necessarily be required to suspend operation, and that indirectly the orders of the Transit Commission will have compelled it to violate that section of the Interstate Commerce Act. The Interstate Commerce Act in this respect refers merely to the voluntary abandonment by the railroad of any part of its system and not to abandonment enforced by statutory regulation.

Furthermore, the orders of the Transit Commission do not compel action thereunder. When it is attempted to enforce the orders, this question may then be raised.

The invalidity of the orders cannot be established by reference to section 15-a of the Interstate Commerce Act which provides for the establishment of a trust fund to consist of one-half the income of carriers in excess of six per cent on the value of the railroad property. The contention of the railroad that if it is required to make the necessary expenditures to eliminate the grade crossings, there will be placed upon interstate commerce an unnecessary and increased burden in the way of rates, and that the government's interests in railroad revenues will be destroyed or impaired has no force, for the government has no interest in the revenues under the statute mentioned, but acts merely as a trustee of the funds so established which may be used by the government to relieve railroads that are in bad financial condition.

That part of paragraph 18 of section 1 of the Interstate Commerce Act which provides that no railroad shall extend its lines without permission from the Interstate Commerce Commission and paragraph 21 of said section which relates to safe and adequate facilities have no application to the present proceeding.

Section 20-a of the Interstate Commerce Act giving the Interstate Commerce Commission jurisdiction over the issuance of capital stock and other securities by railroads does not make the orders in question invalid. The Transit Commission has the power to make the orders and assuming, though not conceding, that the power of the Interstate Commerce Commission with reference to the issuance of securities which may be necessary in this case in order to eliminate the grade crossings transcends the police power of the State exercised for public

safety, then whether the railroad may be compelled to proceed under the orders would depend upon the permission granted by the Interstate Commerce Commission to issue the securities. But that has nothing to do with the power to make the orders in question.

The police power of the State to eliminate grade crossings in the interest of public safety is not subordinate to the power of the Interstate Commerce Commission over interstate railroads.

APPEAL in the above-entitled proceedings by The Staten Island Railway Company and another from a final order of the Transit Commission in each proceeding dated the 23d day of June, 1926, ordering the elimination of certain grade crossings in accordance with certain plans in proceedings designated as 84 and 85 respectively.

*Frederick H. Wood* [*H. Struve Hensel* with him on the brief], for the appellants.

*Clarence M. Lewis* [*Frank C. Bowers* with him on the brief], for the respondent Transit Commission.

*Vincent Victory* [*George P. Nicholson, Corporation Counsel*, with him on the brief], for the City of New York.

LAZANSKY, J. The effect of the orders is to remove the grade crossings in question. The appeals involve the removal of the grade crossing at Bay street, Clifton, and also at Belair road, Hope avenue and Tompkins avenue, Fort Wadsworth. One other crossing was involved, to wit, Maple avenue, Chestnut avenue and St. Mary's avenue. In connection with this, the report and opinion of the chief engineer of the Commission recommended that, " In view of the relatively small and local vehicular traffic over these crossings, I am impressed by the argument made by the property owners. I recommend that this case be discontinued without prejudice to the Commission's right and power to re-open or renew the same at any time in the future." The report of the chief engineer with reference to the elimination of the grade crossings in Nos. 84 and 85 above mentioned covers the two proceedings. Separate hearings were had as to Bay street, and the other streets mentioned. The proceedings were commenced on the initiative of the Transit Commission, which acts in the city of New York as does the Public Service Commission in other places in the State, as provided by section 95 of the Railroad Law (as amd. by Laws of 1913, chap. 354; since amd. by Laws of 1926, chap. 833), which is as follows: " The Public Service Commission may, in the absence of any application therefor, when in its opinion public safety requires an alteration in any existing grade crossing or a change in any

existing structure above or below grade, institute proceedings on its own motion for an alteration in such grade crossing or structure, upon such notice as it shall deem reasonable, of not less than ten days however, to the railroad company  *  *  *  and proceedings shall be conducted as provided in section ninety-one of this chapter." Section 91 of the Railroad Law (as amd. by Laws of 1921, chap. 698) provides for a petition by local authorities to the Public Service Commission alleging that " public safety requires an alteration in the manner of such crossing, its approaches, the method of crossing, the location of the crossing,  *  *  *  the closing and discontinuance of a crossing and the diversion of the travel thereon to another street  *  *  *  or if not practicable to change such crossing from grade, below grade or above grade or to close or discontinue the same."  The section then provides that upon such petition being brought the Public Service Commission shall appoint a time and place for hearing the petition, and shall give due notice thereof as set forth in the act.  The section also provides for a decision by the Public Service Commission and for its communication to all parties to whom notice of the hearing is given.  There is also a provision for appeal which shows the manner in which the case reached this court: " Any person aggrieved by such decision, or by a decision made pursuant to sections eighty-nine and ninety hereof, and who was a party to said proceeding, may within sixty days appeal therefrom to the Appellate Division of the Supreme Court in the department in which such grade crossing is situated, and to the Court of Appeals, in the same manner and with like effect as is provided in the case of appeals from an order of the Supreme Court."

Thus, this railroad company, which says it will become bankrupt if it has to pay one-half of the expense of removing the grade crossings in Staten Island (Railroad Law, § 94, as amd.), comes to this court on appeal from the two orders mentioned.  Before considering the facts, it may be well to refer to article 7, section 14, of the Constitution of the State, which is a new section approved by the people at the general election held November 3, 1925, in effect January 1, 1926.  It is as follows:

" The Legislature may authorize by law the creation of a debt or debts of the State, not exceeding in the aggregate three hundred million dollars, to provide moneys for the elimination, under State supervision, of railroad crossings at grade within the State, at the expense of the State, railroad companies, cities, towns and villages. Of the expense of a grade crossing elimination to which any of the proceeds of such a debt are applied, twenty-five per centum shall be borne by the State, twenty-five per centum by the city,

town or village, and fifty per centum by the railroad company. Laws shall be enacted to provide, so far as practicable, for repayment to the State of moneys advanced in aid of railroad companies, cities, towns and villages, at such times, in such manner and with interest at such rate, that the State shall be able to pay when due the portion of the State debt equal to the proceeds which shall have been so advanced, and interest thereon. The provisions of this article, not inconsistent with this section, relating to the issuance of bonds for a debt or debts of the State and the maturity and payment thereof, shall apply to a State debt or debts created pursuant to this section; except that the law authorizing the contracting of such debt or debts shall take effect without submission to the people pursuant to section four of this article."

As stated, there were two separate hearings. The first that will be considered involves Bay street, Clifton. Although the proceeding under section 95 can only be commenced when the Commission is of opinion that public safety requires an alteration in any existing grade crossing or a change in any existing structure above or below grade, the original order in the Bay street case, directing a hearing, and in the Belair road case, contained no such finding. That question, however, is not presented. As the court must decide in these cases what the power of the Transit Commission is in connection with these grade crossing eliminations, and what proof, if any, is required to justify an order of elimination, it is advisable to state *in extenso* the testimony in each case. In connection with the Bay street, Clifton, case, there is no map which shows clearly the nature of the crossing. There is a photograph, which is attached to an exhibit. At the point in question, three streets — Simonson avenue (or Marathon avenue), Bay street and New York avenue — practically intersect on the crossing. No question is raised here as to the method to be adopted to eliminate this grade crossing. The engineers of the respective parties have agreed as to that. It is proposed to bridge over the crossing. The hearings were had before one Lancaster, who is the chief engineer of the Commission, who made a report to that body.

William L. Selmer, the chief of the division of railroad engineering of the Commission, was the first witness in behalf of the Commission. He had caused a traffic count at the grade crossing in question to be made. Just one count was taken. It was a characteristic week-day count, and shows, between seven A. M. and seven P. M., the following traffic:

" 'TRANSIT COMMISSION
" Transit Bureau
" Grade Crossing Count

Division — East Shore Div., S. I. R. T.

Inv. No. 18159.

Location — Bay Street & New York Avenue.

Date — Mon., March 1, 1926.

Time — 7 A. M. to 7 P. M.

Sheet No. 1.

Inspectors — O'Mara, Traverso, Brosnan & Cassanova.

|  | N. | S. | E. | W. | Totals. |
|---|---|---|---|---|---|
| Pedestrians | 803 | 971 | .... | .... | 1,774 |
| Bicycles | 5 | 8 | .... | .... | 13 |
| Trolleys | 75 | 72 | .... | .... | 147 |
| Automobiles | 947 | 1,012 | .... | .... | 1,959 |
| Vehicles | 37 | 43 | .... | .... | 80 |
| Trains, Passgs | .... | ..... | 77 | 76 | 153 |
| Trains, Freight | .... | .... | 2 | 3 | 5 |
| Light Engines | .... | .... | 32 | 36 | 68 |
| Hand cars | .... | .... | .... | .... | .... |

Weather — Clear."

From this it appears that nearly 150 people and 150 automobiles went over the crossing in an hour; 158 trains, passenger and freight, and 68 engines without cars, were operated by the railroad company during the twelve-hour period. A report of accidents at this crossing from August, 1907, to January 1, 1926, shows that only three accidents happened, one in 1913, one in 1916, and one in 1924. One person was injured in the first and last of these accidents, and, in the second, a vehicle was struck but nobody hurt. Selmer said he was personally familiar with the crossing, and had been working on the crossing question with the Commission since 1910. When asked if in his opinion this crossing was or was not dangerous, he answered without objection, " I think it is dangerous." Nothing was said about public safety. The attitude of the railroad company in connection with this crossing is shown by what was said by its counsel: " Mr. Hensel: This carrier is directed to appear here, and we do not consent or agree to the necessity of the elimination of the grade crossing at Bay street. We do not agree to it either as a single project or as a part of the whole plan that has been submitted by the Transit Commission — we want that thoroughly understood, and we wanted to explain that at the start. We feel that the public safety is well protected now. The financial situation of the carrier at the present time is very serious, and we feel that the outlay involved by the plan,

that is the expenditure, will be well over and beyond our present property investment account, of which we would have to pay one-half. We are barely earning our operating expenses today without suffering a big deficit during the year, and at the same time we do not think that the benefit to be conferred on the public will be in any way commensurate with the expenses that we are asked to incur. But of course we want to reserve all rights to later object on the grounds that the proceeding — that any order that may be made under the present statute is unconstitutional and is in conflict with the Commerce Clause and the Fourteenth Amendment.

" The plan we submit is all subject to those reservations, and our position is that this is a plan which we approve, but, however, we want to object to the whole proceeding. With that understanding I will put Mr. Gosnell on the stand."

A representative of the railroad company, one Gosnell, who is assistant to the chief engineer, said that the estimated cost of this grade crossing change would be $700,000. At the next hearing he said that a further sum of $155,000 should be added to this, making a total of $855,000.

Arthur W. Tidd, an assistant engineer in the office of the chief engineer of the board of estimate and apportionment of the city of New York, and in general charge for the city of grade crossing matters, testified: " Q. What do you think as to whether that is a safe crossing now as it now exists? A. I think it is a dangerous crossing." This testimony was given by him on May 19, 1926, and on cross-examination by the railroad company's representative, he said that he was last at Bay street about a month ago and made an investigation as to the manner in which the public is now protected from accident there. There are gates and signals. He did not know how far the train is from the crossing at the time the alarm bell begins to sound, but he said he observed that the gates were lowered in ample time for safety; that the protection devices were adequately operated in his opinion; for the protection of the trolleys there was a block signal. These hearings were very informal, and one of the difficulties that is presented is the fact that everybody seemed to think it unnecessary to have the record contain all of the details in connection with the crossing. Tidd said that he did not investigate the accident record at the crossing. He was asked: " Q. In your opinion, what kind of a crossing is not a dangerous crossing? " and he answered: " In my opinion, any grade crossing where there is traffic constitutes a dangerous crossing. The potential danger always exists." He made no examination as to whether or not the traffic at Bay street was

local or not, and made no investigation to determine the average speed of the trains.

The cross-examination of Mr. Selmer, one of the engineers of the Transit Commission, had been deferred to a later hearing. He said he had made a general investigation as to the manner in which the public is now protected from accident, but he did not know every detail. He did not know how far the train was from the crossing when the alarm bell begins to sound (it is a fact, and not disputed, that there were at this crossing gates which are lowered and raised by the watchman and signals which announced the approach of trains). He could not give accurate figures to state how far the train was away before the bell begins to sound, but he said it appeared to him that the train was far enough away that adequate warning could be given to the watchman operating the gates. There is a derail on the trolley tracks, so that when the gates are down the derail is operating and the car cannot enter that danger zone. It would be derailed before it would reach the tracks. He did not investigate the accident record for the past twenty years to determine the causes of the accidents. Part of the traffic was local and part of it through. He would say as a general statement that half of the people crossing are familiar with this Bay street crossing. Bay street is a rather wide street. There is a trolley on it. He said it was wide because generally a trolley street is a wide street. Selmer said that there are no sharp turns in the street; that the view is unobstructed. When asked if he had made any investigation to determine the average speed at which the railroad trains cross Bay street, he said, only the general observations that he made while standing at the crossing and that speed varies considerably. He had seen a train going through at thirty miles an hour, and he had seen trains going through possibly not more than fifteen or twenty miles an hour. He had seen freight movements much slower. When asked to state what kind of a crossing is not a dangerous crossing in his opinion, he said: "There is an element of danger at every grade crossing in the whole city or anywhere, so that as a general statement every grade crossing is dangerous, but there are other elements that enter into the determination as to whether a grade crossing should be eliminated or not. It may be that a grade crossing may be situated next to a dock or to a float, from which freight cars may be unloaded, and it will be practically impossible almost to take that car off that float on any other grade but at the grade of the street, and that type of operation is at probably not more than five miles an hour. Under those conditions, why the grade crossing, insofar as my recommendation would be concerned, I would not recommend

its elimination." He further said that he did not know of any grade crossing that is not dangerous. Reference was made to the pamphlet entitled: " The Grade Crossings Problem in the City of New York and its Solution. Report to the Transit Commission by LeRoy T. Harkness, October 15th, 1925," afterwards admitted in evidence as an exhibit. Selmer said it was contemplated by that report to eliminate every grade crossing on Staten Island, with one exception. The total cost was computed at $12,300,000. Since the time of the making of that report the estimated cost has increased from twenty to twenty-five per cent. Staten Island at the present time is a suburban community with country conditions, but is rapidly becoming the other way; a great amount of development is occurring on the island. When asked if he considered the financial conditions of the railroad company in arriving at his determination, he answered that he had given that consideration which was contained in the report of Commissioner Harkness, which he accepted in working up the eliminations. He was largely instrumental in the preparation of the report in so far as the engineering features were concerned. He said that he meant to say that all grade crossings are dangerous to some extent; even in the most carefully protected grade crossing there is a certain element of danger. The only safe kind of a grade crossing was one where a train operation was a very slow freight train with a man walking in front of the train with a flag — the train not going faster than four or five miles an hour. The risk would be at a minimum, but even there there was an element of danger because a child might run in front of the engine. Where there is any sort of operation over a crossing at fast speed, that is, ten to fifty miles an hour, then the element of danger is greater. No scheme has been devised by engineers by which a grade crossing may be made absolutely safe for the simple reason that no matter how many watchmen, gates, bells or derailing switches are used, the human element may fail. Even with the utmost protection an automobile may run wild and crash through the gates. Then there is the possibility of a child running under the gates, and even men and women. What he said applied to all grade crossings.

The foregoing contains all the testimony taken in connection with the question of whether or not public safety required the elimination of this crossing.

The auditor of the railroad company, one Westbrock, testified as to the financial condition of the company. Objection was made to this testimony by the Transit Commission's counsel and decision was reserved. The testimony, however, was considered by the engineer in his report. It will be unnecessary to give the details

of this testimony, as sufficient is presented in the engineer's report who states in this connection as follows:

" Counsel for the Railroad Company states that the carrier estimates the cost of eliminating the grade crossings now under consideration at $1,836,000, and points out that the total cost of the whole plan of eliminations on Staten Island was originally estimated by the Commission at $12,300,000; that subsequent revisions by the Commission's engineers of the estimated cost in these three cases indicate the total cost of all eliminations as at least $15,000,000, and that the carrier estimates the total cost at some $20,000,000; that upon these figures, since one-half of the expense is borne by the railroad, there is entailed upon the latter a total capital expenditure of some $7,500,000 to $10,000,000.

" It is further testified by the Railroad Company that the carrier's present property investment in road and equipment is $12,889,058.35; that for the last five years the carrier has suffered net deficits of over $500,000 per year.

" Counsel for the Railroad Company goes on to point out from these and other figures that requiring the Railroad to carry out the plan for all the eliminations on Staten Island may result in forcing the Railroad to discontinue operation. It has no surplus; it has a continuing deficit which may result in bankruptcy. To offset this, there will be, of course, a considerable saving to the carrier in protection and maintenance costs at the grade crossings, which for all Staten Island is about $130,000 a year. The Railroad Company will also save any expense for claims arising out of grade-crossing accidents, an annual expenditure which is variable but which during 1923 amounted to $6,056.15. These two savings would equal the interest and amortization, at 6%, on $2,270,000."

According to the testimony of its auditor, Westbrock, the railroad has not been operating at a profit during the past five years. Its deficits were as follows: 1921, $540,415.84; 1922, $823,024.48; 1923, $501,527.18; 1924, $570,090.25; 1925, $568,066.54. I suppose by deficit is meant operating loss and depreciation. It does not require a mind skilled in finance to know that the profit must be made in some other direction, by benefits obtained through the operation of this route. The division engineer of the railroad company described the situation and the safety appliances in connection with this crossing. East of Bay street there is a junction between the Tottenville line and the South Beach line, and that junction necessitates an interlocking plant. The interlocking plant is there to protect the street car service. Arrangements are made so that when a signal is given a train to proceed over the crossing in either direction, a danger signal must be set

Second Department, March, 1927.          [Vol. 220

up for the approaching trolley car, and in addition to the danger
signal, a derail must be set so as to put the trolley car off the
track to prevent crossing in front of the train.   It is impossible
for the trolley car to be on the tracks at the same time as the
train.   For the pedestrian and vehicles gates are provided, and
a crossing watchman is provided, who operates the gates by air.
The air is provided from the shops so that he does not have to
pump the gates up or down; he throws them one way or another
by a lever which he controls.   There are approach circuits in
advance of the interlocking circuits.   A train coming from Totten-
ville, proceeding in the direction of St. George, operates an indicator
in the tower at a distance of 6,789 feet, or over a mile from Bay
street.   It is a miniature signal set off automatically by the train
crossing a spot over a mile away from the crossing.   The indicator
is set automatically, and the train goes on an interlocking circuit
4,277 feet from the crossing.   When it is on that other circuit,
that ties up the plant, and when it is in the interlocking limits,
the man cannot make any changes in his set-up.   The arrangement
is that when a train indicates that it is on the approaching circuit,
the towerman advises the operator of the gates by a bell that there
is a train on the circuit and that he must begin to look for a point
in the traffic to put down his gates.   Then the operator of the
gates begins to sound his alarm warning that he is preparing to
put down the gates.   That notifies the pedestrians and vehicular
traffic that the gates are about to be lowered.   It is a large gong
which can be heard above any ordinary noise.   As I understand
the system, the towerman is first notified by a signal that the
train is approaching and then the towerman notifies the gate
operator.   The gate operator gives warning by a gong to the
public and lowers the gates.   The gates are all painted black and
white, so as to be seen at a distance.   Trains coming from St.
George, going in the direction of either South Beach or Tottenville,
have an advance indication of 3,673 feet.   Speaking generally, it
appears that when a train is about a mile away, it automatically
signals the towerman that it has entered that circuit.   The tower-
man then signals the gateman, who begins to lower the gates.
This is practically all done instantaneously and when the train is
about in the neighborhood of a mile distant.   Thus the gates go
down, making it impossible for anybody to cross the tracks with-
out crawling under or running through the gates.   The division
engineer further said that there is a slight possibility of man fail-
ure in connection with this operation.   If the air service for the
gates failed, the man could lower the gates, but he could not
raise and lower them.   He would have to take steps to flag

the crossing.  If anything of that kind happened they would have additional help, so they could have a flagman on both sides of the crossing, and they would not have to depend on the gates.  He said that anything mechanical has a possibility of failure; that gates are not as complete a protection as grade separation, but they provide such reasonable protection that, unless the automobile driver throws away all caution, he has every reason to expect safety at the crossing if he approaches it with reasonable care and caution.  Of course he assumed, I take it, that all the links in the chain in this process were intact.  He said he had been acquainted with the system for five and one-half years, and had no recollection of the failure of the air service.  Nor has he ever heard of a failure of man power there.  He said there was a possibility that if the towerman or gateman fainted, the gate might not go down, but the fallibility element was so remote that he would consider it practically infallible.  He bases this on the experience of fifteen years.

W. G. Curren, the general manager of the railroad company, gave testimony in connection with expenditures that the company would be required to make under section 53-a of the Public Service Commission Law, commonly known as the Kaufmann Act, for the electrification of the freight and passenger service, including a bridge from New York to New Jersey, that would cost from $14,000,000 to $40,000,000.  The railroad company has no surplus out of which it could finance the expenditures required by the elimination of the Bay street crossing.  It would have to borrow the money.  He said that as far as the company was concerned, it had a record of only two accidents at the Bay street crossing.  The Transit Commission had a record of three.  One of the accidents was on December 14, 1913, when an automobile ran through the gates, breaking the gates as well as the windshield of the automobile.  This happened at six-one P. M.  On April 3, 1924, at six-fifteen A. M., a woman stepped under the gates, which had already been lowered, and was struck.  She received a cut on the head.  In each of these two cases the gates were down in proper position.  This constitutes all the proof submitted as to this crossing which requires any consideration.  A statement was made by Mr. Hensel, representing the railroad company, as follows:

" That concludes the case for the carrier.  The carrier would like to make a statement.  The carrier objects to the making of any order by the Transit Commission in this proceeding commanding the elimination of the Bay Street crossing at grade for the following reasons:

" The evidence fails to show that such elimination is required by public safety, but on the contrary, it affirmatively appears that

the public safety has been for the past twenty years and now is adequately protected, and does not require this elimination.

"*Secondly*, any such order would deprive this carrier of its property without due process of law in violation of the Constitution of the State of New York, the Fourteenth Amendment to the Constitution of the United States of America.

"*Thirdly*, any such order would deprive this carrier of equal protection of the laws in violation of the Fourteenth Amendment of the Constitution of the United States of America.

"*Fourthly*, any such order would likewise be in conflict with the commerce clause of the Constitution of the United States, and with the other acts of Congress passed thereunder, especially with the act to regulate commerce and the maintenance thereof.

"In addition the carrier wishes to object to any order being entered requiring the present bridge over Willow Avenue to be raised, on the ground that it is beyond the authority of the Transit Commission to order that either in this hearing or in any other hearing under the powers of the Transit Commission as they are now defined by law."

It was conceded that the Staten Island Rapid Transit Railway Company is an interstate carrier engaged in interstate commerce, and has filed tariffs as required by the Interstate Commerce Commission.

With regard to the case involving Belair road, Hope avenue and Tompkins avenue, there is no map or diagram in the printed case which shows the situation with reference to these streets in a definite and clear way. There are some blueprints which were submitted in connection with the improvement. These may show the locality better, but I do not think they are necessary to the decision here. Selmer, who had testified in the other case as chief of the division of railroad engineering of the Transit Commission, said he had compiled from the files of the Commission a statement of the accidents at the grade crossings at Belair road, Hope avenue and Tompkins avenue (it will be remembered that Maple avenue, Chestnut avenue and St. Mary's avenue were discontinued). The record of accidents shows Belair road, none; Hope avenue, November 26, 1912, person struck, one injured; November 18, 1921, person struck, one killed; Tompkins avenue, August 23, 1913, person struck, one killed; June 21, 1925, vehicle struck, six injured. Selmer said that in his opinion these crossings were dangerous. They are now protected by the use of gates, operated by a watchman. The fact that there have been in all four accidents at these crossings in a period of nineteen years did not have any influence in the opinion of Selmer as to the dangerous quality of the crossings.

He believed that an accident is liable to occur at any one of these crossings at any time; that view is in line with the general engineering opinion, that any grade crossing, no matter how well protected, is a source of danger, because man power governs a whole lot, and man power failure seems to be a common and inevitable thing. There may be no accidents in twenty years, and then there may be a terrible one.   The traffic count shows:

" TRANSIT COMMISSION
" Transit Bureau
" GRADE CROSSING COUNT
" Division — East Shore Div.— S. I. R. T.            Inv. No. 18159
" Location — Hope Ave. Ft. Wadsworth
" Date — Mon. Mar. 1, 1926.   Time 7 A. M. to 7 P. M.   Sheet No. 6
" Inspectors — Foley — Hille

|  | N. | S. | E. | W. | Totals |
|---|---|---|---|---|---|
| Pedestrians | 63 | 70 | .... | .... | 133 |
| Bicycles | 1 | 1 | .... | .... | 2 |
| Trolleys | 0 | 0 | .... | .... | 0 |
| Automobiles | 31 | 35 | .... | .... | 66 |
| Vehicles | 3 | 3 | .... | .... | 6 |
| Trains — Passgs | .... | .... | 44 | 44 | 88 |
| Trains — Freight | .... | .... | 0 | 0 | 0 |
| Light Engines | .... | .... | 0 | 0 | 0 |
| Hand Cars | .... | .... | 0 | 0 | 0 |

Weather — Clear "

" TRANSIT COMMISSION
" Transit Bureau
" GRADE CROSSING COUNT
" Division — East Shore Div.— S. I. R. T.            Inv. No. 18159
" Location — Belair Rd. Ft. Wadsworth
" Date — Mon. Mar. 1, 1926.   Time 7 A. M. to 7 P. M.   Sheet No. 5
" Inspectors — Hanley — Levine

|  | N. | S. | E. | W. | Totals |
|---|---|---|---|---|---|
| Pedestrians | 27 | 140 | .... | .... | 167 |
| Bicycles | 0 | 0 | .... | .... | 0 |
| Trolleys | 0 | 0 | .... | .... | 0 |
| Automobiles | 0 | 1 | .... | .... | 1 |
| Vehicles | 0 | 2 | .... | .... | 2 |
| Trains — Passgs | .... | .... | 44 | 44 | 88 |
| Trains — Freight | .... | .... | 0 | 0 | 0 |
| Light Engines | .... | .... | 0 | 0 | 0 |
| Hand Cars | .... | .... | 0 | 0 | 0 |

Weather — Clear "

" TRANSIT COMMISSION
" Transit Bureau
" GRADE CROSSING COUNT

" Division — East Shore Div.— S. I. R. T. Inv. No. 18159
" Location — Tompkins Ave. Ft. Wadsworth
" Date — Mon. March 1, 1926. Time 7 A. M. to 7 P. M. Sheet No. 7
" Inspectors — W. Murphy — Clinton

|  | N. | S. | E. | W. | Totals |
|---|---|---|---|---|---|
| Pedestrians......... | 190 | 195 | .... | .... | 385 |
| Bicycles............ | 0 | 0 | .... | .... | 0 |
| Trolleys............ | 0 | 0 | .... | .... | 0 |
| Automobiles........ | 190 | 190 | .... | .... | 380 |
| Vehicles............ | 13 | 9 | .... | .... | 22 |
| Trains — Passgs..... | .... | .... | 45 | 43 | 88 |
| Trains — Freight.... | .... | .... | 0 | 0 | 0 |
| Light Engines....... | .... | .... | 0 | 0 | 0 |
| Hand Cars.......... | .... | .... | 0 | 0 | 0 |

Weather — Clear "

The report was the result of inspection on March first, between the hours of seven A. M. and seven P. M. The report shows the traffic is not very heavy. Tompkins avenue is twice as much as either of the other two, and there it appears that a little over thirty pedestrians crossed in an hour, and a like number of automobiles. It does, however, appear that eighty-eight trains went over the crossing during that period. It was the typical week-day count and the witness believed it would be increased on a Sunday or holiday, and also increased if the count were taken in the summer months rather than the winter months. The witness thought that the count represented a small day and not a large one by comparison with the whole year. The method of eliminating the crossing was by a depression of the railroad tracks, as to which the respective engineers were in agreement. The cost of doing the work at these crossings would be $647,000. The Harkness report was also received in evidence in this case.

On cross-examination, Mr. Selmer said he made a general observation as to the average speed at which railroad trains cross these crossings. It was the ordinary operation, not different from any other locality where a passenger train is operated. The conditions are suburban, comparable to the ordinary suburb of New York. When asked what kind of a grade crossing is not a dangerous grade crossing, he said: " As I explained in the other two cases on Staten Island, there is a potential danger at every grade crossing, and it is only a matter of expediency and cost that exceptions to

a determination for eliminations are made. There are very few such exceptions in the City of New York." He said that Staten Island was included in the grade crossing elimination plan, and it was obvious that the Transit Commission was to eliminate all grade crossings in the city, playing no favorites; while it was decided to eliminate grade crossings, studies were special in character like all other eliminations; they divided them into groups; they did not take all the grade crossings in the whole of Staten Island and determine that they must be eliminated as one class of grade crossings; they had to study each and every grade crossing and put it in a certain group; one grade crossing may be particularly dangerous, and in order to eliminate it, a grade crossing may be very close to it, and have very little traffic on it, still it must be included in the treatment of the very dangerous grade crossings. He said he understood that this same program was applicable to the whole State. He has not examined the crossing accidents for the purpose of ascertaining whether or not the accidents were the result of the failure of the men guarding the crossings. The testimony of witnesses with reference to the resources of the railroad company, and the other testimony given in the Bay street case by the witnesses Westbrock and Curren, were received as if testified to in this proceeding, subject to the reservation of a ruling by the chief engineer as to admissibility. The railroad company made the same arguments against the elimination of these grade crossings as it did in the case of Bay street. The report of the Transit Commission, which was admitted in each of these proceedings, recites that there are 400 grade crossings, of which 308 should be eliminated as soon as possible. During the period between July 1, 1907, and January 1, 1925, 253 people were killed and 426 injured. In this report it is stated: " With the ever-increasing growth of population and traffic, there should not be a grade crossing in New York City ten years hence over which high-speed trains operate."

It appears that there are seventy-three grade crossings on the lines of the Staten Island Railway and the Staten Island Rapid Transit Railway Companies, a number of which are particularly dangerous. " They are listed below in the order in which the engineers of the Commission, after careful study and analysis, believe they should be eliminated." The first one is Bay street. The fifth is Belair road, which includes, I take it, the other two streets. Of the crossings mentioned, other than those involved in these proceedings, two have been completed and final orders issued in two others.

So as to indicate the policy of the State, it is well to refer to

chapter 510 of the Laws of 1926, which was undoubtedly passed in support of the constitutional amendment above referred to — article 7, section 14. It makes special reference to the Transit Commission. It provides in part (§ 1): " Notwithstanding any inconsistent provisions of article three of the Railroad Law, or of any other law, general or special, all existing railroad crossings at grade within the jurisdiction of the Transit Commission shall be eliminated in the manner prescribed by this act, in all cases where the expense of such elimination is to be borne jointly by the State, the railroad corporation, and the city. The Transit Commission shall from time to time, by its order, designate the crossing or crossings the elimination of which the public safety requires, and the manner in which such elimination shall be made  *  *  *." Section 2 provides that the cost of all eliminations shall be borne twenty-five per centum by the State, twenty-five per centum by the city, and fifty per centum by the railroad corporation. Under section 3, there is provision for the payment out of proceeds of State bonds to be used in the first instance to pay the entire expense unless the railroad or the city shall elect to pay directly out of its funds the whole or any portion of the expense to be borne by it in the elimination of any crossing. It will not be necessary to go into any further details of this statute. It indicates, however, a policy of grade crossing elimination. But we have in this statute, as in the Railroad Law, the same provision for elimination which " public safety requires." This statute became a law in April, 1926, after the notice of hearing was signed by the Commission, but before the conclusion of the proceeding. It also became a law after the order of hearing was made, but before the conclusion of the proceeding.

The next matter to which attention will be called is the report and opinion of the chief engineer. It seems to be the procedure in these matters for the proof to be taken before the chief engineer and for him to make a report and give his opinion, and then for the Commission to act upon that report and opinion. The order recites the approval and adoption of the report and opinion, and the order is based on that. There is no recital indicating that the Commissioners have read the proof. That question, however, is not raised. It is stated in the report: " The record of these hearings shows a recent toll of accidents at some of these crossings." This is not an accurate statement, because at Bay street the last accident was April 3, 1924, when a person was injured. The accident before that was in 1916, when nobody was hurt; and before that in 1913, when one person was injured at the Bay street crossing; and from 1907 to 1926 there was no accident at Belair road; at Hope avenue,

one person injured in 1912, and one killed in 1921; at Tompkins avenue, one person killed in 1913, and, June 21, 1925, six person. injured.  What the nature of the injuries was in this last accident does not appear, but it is the only one of the crossings at which there were a number of people hurt at one time of recent date. He also says that Selmer, the chief engineer of the division of railroad engineering, said in his opinion that these crossings constituted a menace to public safety.  Selmer said no such things He said that they were dangerous crossings.  He said that all railroad crossings were dangerous.

The railroad company claims that the Commission has not been given unlimited jurisdiction to require the elimination of all grade crossings upon the ground that every such crossing is dangerous, but only when, under the particular circumstances of the particular case, public safety requires elimination.  It also claims that the orders should be set aside because based upon an erroneous principle of law and because contrary to the weight of the evidence.  It urges that these orders deprive the appellant of its property without due process of law in violation of the Fourteenth Amendment to the Constitution of the United States and of section 6 of article 1 of the Constitution of the State of New York; and also that the orders are void because in conflict with the commerce clause of the United States Constitution and the acts of Congress passed pursuant thereto, having particular reference to the Transportation Act.

The first question that must receive consideration here is, what facts must appear before the Commission before it may determine that public safety requires the elimination of the crossing.  It may be safe to say that the mere existence of a crossing is not of itself sufficient upon which to predicate such a determination.  While a crossing may be dangerous, it is only when public safety requires its elimination that the Commission may so order.  That the Legislature meant something more than the mere existence of a grade crossing necessary for such determination by the Commission, is apparent from the fact that a hearing is required.  If the Legislature, assuming it had the power so to provide, meant that all grade crossings should be eliminated, then there would be no necessity of a hearing.

This court does not pass upon the facts except to decide if they fairly warrant the conclusion of the Commission.  The rule adopted in this connection is fairly stated in *Matter of Village of Hobart* (204 App. Div. 595), in the dissenting opinion of VAN KIRK, J., in this respect in no wise at variance with the majority

opinion.   That case is cited by the appellant.   Mr. Justice VAN
KIRK says (at p. 600):

" The rules which govern the appellate court in review of orders
of the Public Service Commission are established.   ' " This mode
of proceeding, while it grants the court power to review the action
of the commissioners, plainly indicates that the court is to treat
the application as in the nature of a review of the decision of a
subordinate tribunal, and not as it would an original application
made to it in the first instance.   The burden rests upon the petitioner
to show affirmatively that the commissioners erred in their deter-
mination."   *   *   *   Unless the court can see that the decision of
the Board of Railroad Commissioners was founded upon erroneous
legal principles, or that it proceeded contrary to the clear weight of
evidence in arriving at its conclusion upon any question of fact,
or that it has abused the discretion vested in it, and has arbitrarily
refused to issue the necessary certificate, I do not think that the
court should reverse its determination.'   [Citing cases.]   The ques-
tions to be determined under a certiorari order to review the
determination of a body or officer (Civ. Prac. Act, § 1304; Code
Civ. Proc. § 2140) are stated as follows:

" ' The questions involving the merits to be determined by the
court upon the hearing are the following only:   *   *   *

" ' 4. Whether there was any competent proof of all the facts
necessary to be proved in order to authorize the making of the
determination.

" ' 5. If there was such proof, whether, upon all the evidence,
there was such a preponderance of proof against the existence
of any of those facts that the verdict of a jury, affirming the existence
thereof, rendered in an action in the Supreme Court triable by
a jury, would be set aside by the court as against the weight of
evidence.'

" This statute states proper rules to apply as well upon a review
on appeal of the order of the Commission."

It is claimed that the action proceeded upon an erroneous principle
of law, in that the basis of its action was that all grade crossings
are dangerous and, therefore, these crossings, regardless of sur-
rounding   circumstances   and   conditions,   were   dangerous.   The
report does not go that far.   It does show that Selmer, chief of
the division of railroad engineering of the Transit Commission,
gave as his opinion " that these crossings constituted a menace to
public safety."   The report also says: " Practically all grade
crossing accidents occur because of the failure of the human element,
and that there has been no failure on the part of that element for
a number of years is no assurance that this good fortune will con-

tinue." And further: " The mere absence of accidents at a particular crossing by no means demonstrates the absence of danger." The report indicates that the basis of the recommendation was that these crossings were dangerous, and, therefore, public safety required their elimination. Is there proof here which fairly warranted the determination of the Commissioners, whose opinion with reference to such matters is entitled to weight and consideration? (*Matter of Boston & Albany R. R. Co.*, 64 App. Div. 257; affd., 170 N. Y. 619.) As stated before, the provisions of the act clearly indicate that it was not intended to apply to all grade crossings regardless of conditions. But in all cases public safety is the essential factor and the existence of that requirement must be fairly shown. Just when public safety requires the elimination of a grade crossing cannot be stated in so many words. Men may differ as to requirements or conditions. The surrounding physical conditions, the methods adopted for avoiding accidents, the amount of traffic, including train operation, are items which should be taken into consideration. That there have been few, or even no accidents for a number of years, is not conclusive against the finding that public safety requires elimination. It is, of course, an item of importance and should be considered. But of no less importance is the fact that common experience shows that there is always a likelihood of serious disaster despite the best precautions (always carrying with them, however, an element of uncertainty) which human agencies may adopt. It surely is not necessary to await a serious disaster, always possible, especially when there is considerable use of a crossing. While at Belair road, Hope avenue and Tompkins avenue the vehicular and passenger traffic across the railroad tracks is not extensive, the number of trains is considerable; eighty-eight trains in twelve hours — over seven in an hour — present a potential danger the removal of which one might reasonably say public safety requires. Such a determination is fairly based upon fact. The time was when the State did not interfere in such matters. But in many ways, by legislation, it has been the effort of the State to try to eliminate danger to life and limb. The policy of the State in this connection as to railroad crossings is particularly emphasized by the constitutional amendments adopted at the election of 1925, and the legislation of 1926 with reference thereto. By article 7, section 14, of the State Constitution the People of the State authorized the Legislature to create debts to the extent of $300,000,000 to provide moneys for the elimination of grade crossings. What public safety required twenty-five years ago, and what it requires to-day are two different things. The law should and does recognize that the value of human life is

of more importance than the dollar. While it is true that the traffic at these three streets is small, yet in light of the large number of trains that are run, there is always the likelihood of a very serious accident. This is pointed out in the report and opinion of the engineer. For this reason, in my opinion, the conclusion was justifiable that public safety requires the removal of these three crossings. Upon this basis, of course, there can be no question about Bay street, where 226 trains and engines pass over the crossing in twelve hours. The pedestrian and vehicular traffic is considerable.

The appellant argues that these orders deprive it of its property without due process of law in violation of the State and Federal Constitutions. The basis of this is that the removal of these crossings is arbitrary and unreasonable, and that the expense thereof will make a bankrupt of this railroad company. In discussing this question the railroad company refers to the fact that there are seventy-three grade crossings and all of them will be eliminated if the rule adopted in these cases is followed. There is, of course, no proof that other crossings will be eliminated, although it is undoubtedly the purpose of the Commission to proceed in that direction. But assuming what is claimed to be the fact, the contention of the appellant is completely answered by the attitude adopted by the United States Supreme Court in this connection. In *Erie R. R. Co.* v. *Board of Public Utility Commrs.* (254 U. S. 394, 410) it is stated: "Grade crossings call for a necessary adjustment of two conflicting interests — that of the public using the streets and that of the railroads and the public using them. Generically the streets represent the more important interest of the two. There can be no doubt that they did when these railroads were laid out, or that the advent of automobiles has given them an additional claim to consideration. They always are the necessity of the whole public, which the railroads, vital as they are, hardly can be called to the same extent. Being places to which the public is invited and that it necessarily frequents, the State, in the care of which this interest is and from which, ultimately, the railroads derive their right to occupy the land, has a constitutional right to insist that they shall not be made dangerous to the public, whatever may be the cost to the parties introducing the danger. That is one of the most obvious cases of the police power, or to put the same proposition in another form, the authority of the railroads to project their moving masses across thoroughfares must be taken to be subject to the implied limitation that it may be cut down whenever and so far as the safety of the public requires. It is said that if the same requirement were made for the other grade crossings of the road it would soon be bankrupt. That the

States might be so foolish as to kill a goose that lays golden eggs for them, has no bearing on their constitutional rights. If it reasonably can be said that safety requires the change it is for them to say whether they will insist upon it, and neither prospective bankruptcy nor engagement in interstate commerce can take away this fundamental right of the sovereign of the soil. *Denver & Rio Grande R. R. Co.* v. *Denver,* 250 U. S. 241, 246. To engage in interstate commerce the railroad must get on to the land and to get on to it must comply with the conditions imposed by the State for the safety of its citizens. Contracts made by the road are made subject to the possible exercise of the sovereign right. *Denver & Rio Grande R. R. Co.* v. *Denver,* 250 U. S. 241, 244; *Union Dry Goods Co.* v. *Georgia Public Service Corp.,* 248 U. S. 372; *Louisville & Nashville R. R. Co.* v. *Mottley,* 219 U. S. 467; *Northern Pacific Ry. Co.* v. *Duluth,* 208 U. S. 583; *Manigault* v. *Springs,* 199 U. S. 473, 480. If the burdens imposed are so great that the road cannot be run at a profit it can stop, whatever the misfortunes the stopping may produce. *Brooks-Scanlon Co.* v. *Railroad Commission of Louisiana,* 251 U. S. 396. Intelligent self-interest should lead to a careful consideration of what the road is able to do without ruin, but this is not a constitutional duty."

In light of this decision nothing further need be said.

But the appellant says the *Erie* case is not the final word with reference to the rights of the railroad company. It asserts that the Interstate Commerce Act, as amended by the Transportation Act of 1920, has created a new Federal policy which makes the police power of the State subordinate to the provisions of the act in question. The first contention is that by an amendment to paragraph 18 of section 1 of the Interstate Commerce Act, it is provided that "no carrier by railroad subject to this act shall abandon all or any portion of a line of railroad, or the operation thereof, unless and until there shall first have been obtained from the Commission a certificate that the present or future public convenience and necessity permit of such abandonment." (41 U. S. Stat. at Large, 477.) It is urged that the orders made by the Transit Commission and those that are contemplated will compel the railroad company to abandon its operation. Thus, says the appellant, by reason of this amendment to the Interstate Commerce Act, which was not involved in the *Erie* case, that case is no longer in point. It is urged that since the railroad cannot be discontinued without the permission of the Interstate Commerce Commission, it is not within the power of the Transit Commission to bring about that result indirectly without the action of the Interstate Commerce Commission. Appellant finds consolation for this claim, and some

others that will be presently discussed, from a sentence taken from an opinion of Chief Justice Taft in *Railroad Comm.* v. *Southern Pac. Co.* (264 U. S. 331, decided in 1924). The question in that case was whether the Railroad Commission of California had the power to require three railroads to build an interstate union depot in the city of Los Angeles. Although the proceedings were begun in 1916, before the hearings closed and the decision was made, the Transportation Act of 1920 was enacted, and thereafter the railways were required to remove certain grade crossings and to build a union terminal within a certain defined area in the city. In the California courts the Railroad Commission argued that in view of the finding that the union station was an indispensable element in getting rid of the grade crossings, it had the incidental right to order its building. The Supreme Court of California rejected this argument and held: " That notwithstanding the views expressed by the Railroad Commission in its findings and conclusions in the proceeding herein presented for review, we can perceive no indispensable relation between the elimination of grade crossings and the establishment of union depot facilities, nor can we see an unsurmountable difficulty why jurisdiction over the matter of eliminating grade crossings may not be exercised in a proper case consistently, and it may be concurrently, with the exercise of the authority which is vested by the Act of Congress of 1920 in the Interstate Commerce Commission over the subject of union terminal depot facilities." Thus the California court held that the State Commission still had the power over grade crossings, although it might be concurrent with the powers given under the Interstate Commerce Act. The opinion of Chief Justice Taft states: " The State Supreme Court thus modifies the findings of the Railroad Commission in so far as they sought to tie the validity of its order establishing a union station to its unquestioned police power to regulate grade crossings in the interest of the public safety. We avoid any inquiry how far, if at all, the principle laid down in *Erie R. R.* v. *Board of Public Utility Commrs.*, 254 U. S. 394, is qualified by the provisions of the Transportation Act."

The appellant also finds balm in a dictum of Judge Pound, in *McAneny* v. *N. Y. C. R. R. Co.* (238 N. Y. 122, 131), as follows: " When it comes to the question of State legislative power to impose great expense on interstate railroads without the action of the Interstate Commerce Commission, the position of the railroads would probably be materially strengthened by the recent decision of the Supreme Court of the United States in *Railroad Commission* v. *Southern Pacific Co.* (*supra*)." In the face of this statement

in the *Southern Pacific* case, the same court in *Missouri, K. & T. R. Co.* v. *Oklahoma* (271 U. S. 303) stated as follows: " It is elementary that for the safety and convenience of the public, the State, either directly or through its municipalities, may reasonably regulate the construction and use of highways where they cross railroads. The legitimate exertion of police power to that end does not violate the constitutional rights of railroad companies. They may be required at their own expense to construct bridges or viaducts whenever the elimination of grade crossings reasonably may be required, whether constructed before or after the building of the railroads." A number of cases are cited, including the *Erie Case* (*supra*). None of the questions which the appellant submits were involved in the case from which the quotation has just been given, but this general statement would indicate that when the question is directly raised, the United States Supreme Court will hold that the police power of the State to be exercised for public safety, is not subordinate to, but is paramount to the provisions of the Interstate Commerce Act. I am inclined to the opinion that the abandonment mentioned in the Transportation Act is intended to mean a voluntary act and not one enforced by statutory regulation. Furthermore, the orders in question do not compel action thereunder; when it is attempted to enforce them, the question may be raised.

The appellant calls attention to the fact that the United States under the amended act is really in the railroad business. Under a new section (§ 15-a) added to the Interstate Commerce Act by the Transportation Act of 1920, paragraph 5 provides: " Inasmuch as it is impossible (without regulation and control in the interest of the commerce of the United States considered as a whole) to establish uniform rates upon competitive traffic which will adequately sustain all the carriers which are engaged in such traffic and which are indispensable to the communities to which they render the service of transportation, without enabling some of such carriers to receive a net railway operating income substantially and unreasonably in excess of a fair return upon the value of their railway property held for and used in the service of transportation, it is hereby declared that any carrier which receives such an income so in excess of a fair return, shall hold such part of the excess, as hereinafter prescribed, as trustee for, and shall pay it to, the United States." Paragraph 6 provides that if a carrier receives a net railroad operating income in excess of six per cent of the value of the railway property, one-half of such excess shall be placed in a reserve fund maintained by the carrier, and the remaining one-half is to be paid to the Interstate

Commerce Commission for the purpose of establishing and maintaining a general railroad contingent fund which, under paragraph 10, is to be used by the Commission in the furtherance of the public interest in railway transportation, either by making loans to carriers to meet expenditures for capital account or to reduce maturing securities, or by purchasing transportation equipment and facilities and leasing the same to carriers. (41 U. S. Stat. at Large, 489 *et seq.*)

The appellant says that if this railroad company is to make the expenditures required for these grade crossing eliminations, it may not only burden interstate commerce with increased exactions in the way of rates, but may directly destroy or impair the government's own interest in railroad revenues collected as a trustee for it. In the first place, the government under this provision has no interest in the revenues. It is merely a trustee. I see no relationship between the orders of the Transit Commission and this part of the Federal Transportation Act, except, it would seem, that the reserve fund created might be used to help the appellant. If railroad rates must be enhanced to save human life, it will be a step in the right direction, entitled to general commendation.

The next proposition submitted by the appellant makes reference to another part of paragraph 18 of section 1 of the Interstate Commerce Act, as amended by the Transportation Act of 1920, by which it is provided that " no carrier by railroad subject to this act shall undertake the extension of its line of railroad, or the construction of a new line of railroad, or shall acquire or operate any line of railroad, or extension thereof, or shall engage in transportation under this act over or by means of such additional or extended line of railroad, unless and until there shall first have been obtained from the Commission a certificate that the present or future public convenience and necessity require or will require the construction, or operation, or construction and operation, of such additional or extended line of railroad." (41 U. S. Stat. at Large, 477.) The appellant says the purpose of this section is to protect the public against improvident investment and to avoid the dissipation of railroad assets or credits. No reference, however, is made in this section to grade crossings. Attention is also called to paragraph 21 of section 1 of the Interstate Commerce Act, as amended by the Transportation Act of 1920, by which the Commission may require the railroad to provide itself with safe and adequate facilities for performing its car service, and subject to the provision that an extension of the road or of the car service shall not impair the ability of the carrier to perform its duty to

the public.    (41 U. S. Stat. at Large, 478.)    This has no reference whatsoever to grade crossings.

The next claim made by the appellant is that this order is an interference with the power of the Interstate Commerce Commission under the act, section 20-a, added by the Transportation Act of 1920, which provides in effect:  The common carrier may not issue any capital stock or any bond or other evidence of debt, or assume any obligation even though permitted by the authority creating the common carrier, unless and until, and then only to the extent that, upon application by the carrier and after investigation by the Commission of the purposes and uses of the proposed issue and the proceeds thereof, the Commission by order authorizes such issue or assumption.    The Commission is permitted to make the order if it finds that the issue or assumption: (a) is for some lawful object within its corporate purposes, and compatible with the public interest, and will not impair the ability of the carrier to perform the service. (41 U. S. Stat. at Large, 494.)

With reference to the Transportation Act, the United States Supreme Court in *Railroad Comm.* v. *Southern Pac. Co.* (*supra*), quoting from *Dayton-Goose Creek R. Co.* v. *United States* (263 U. S. 456, 478): says: " ' The new act seeks affirmatively to build up a system of railways prepared to handle promptly all the interstate traffic of the country.  It aims to give the owners of the railways an opportunity to earn enough to maintain their properties and equipment in such a state of efficiency that they can carry well this burden.   To achieve this great purpose, it puts the railroad systems of the country more completely than ever under the fostering guardianship and control of the [Interstate Commerce] Commission, which is to supervise their issue of securities, their car supply and distribution, their joint use of terminals, their construction of new lines, their abandonment of old lines, and by a proper division of joint rates, and by fixing adequate rates for interstate commerce, and in case of discrimination, for intrastate commerce, to secure a fair return upon the properties of the carriers engaged.' "

As to section 20-a and the issue of securities, it is said in the opinion of the chief justice (at p. 347), in the case last mentioned: " To be sure this provision only becomes operative when securities have to be issued and would not, of itself, prevent action by a State commission until such securities are seen to be necessary."

Thus it seems to me that the Transit Commission may make its order, and assuming, without conceding, that the power of the Interstate Commerce Commission with reference to the issuance

of securities transcends the police power of the State exercised for public safety, then whether the railroad may be compelled to proceed or not would depend upon the permission granted by the Interstate Commerce Commission to issue the securities. That has nothing to do with the making of the orders here involved.

The basic question involved in these points of the appellant is whether or not the police power of the State is to be subordinated to the power of the Interstate Commerce Commission. In light of the opinion in the *Erie* case, despite what was said in *Railroad Comm.* v. *Southern Pac. Co.* (*supra*), it is my opinion that we should adhere to the views expressed by Mr. Justice Holmes in the *Erie* case until we are advised to the contrary by the court of last resort. I doubt it will be held that the value of human life in the States is to be measured upon the basis of freight rates and income to interstate railroads. If the car barns of this railroad were burned down, and it was proposed to build a car barn of wood against the ordinances of the city which require a fireproof building, and if it could be assumed that the difference between the costs was prohibitive, on the basis of the discussion here, is it to be believed that the Interstate Commerce Act, as amended by the Transportation Act, would make the city of New York and the safety of its inhabitants helpless against it? I am not now willing to subscribe to such a doctrine. One would have to be willing to affirm it in order to reach the result sought by the appellant.

The final orders of the Transit Commission should be affirmed, without costs.

Manning, Young and Kapper, JJ., concur; Kelly, P. J., concurs in separate memorandum.

Kelly, P. J. (concurring). I think the arguments of the railroad company that compliance with these orders for the elimination of existing grade crossings will result in the bankruptcy of the corporation, are for the Legislature and not for the courts to pass upon. They present serious considerations but the Supreme Court of the United States has so decided in the *Erie* case, cited by Mr. Justice Lazansky. It was the original scheme of this grade crossing legislation in 1890, following the general plan of the grade crossing legislation in Massachusetts then in force, that in providing for changes in existing grade crossings so as to carry the highways over or under the tracks by bridges or tunnels, that when such alteration was made with the attendant expense to the State, the particular locality and the railroad company, other grade crossings in the neighborhood should be eliminated altogether, and the highway traffic diverted to the new crossing. Such incon-

venience as might be occasioned by closing these other crossings was compensated by the additional safety guaranteed to the user of the highway by the bridge or tunnel. In this way the prohibitive expenditure to the State, the locality and the railroads of changing *all* grade crossings to bridges or tunnels was to be avoided. But these are legislative questions to be determined by the Legislature and not by the courts.

In each proceeding: Final order of the Transit Commission unanimously affirmed, without costs.