**In re NEW YORK, O. & W. RY. CO.**

**No. 68276.**

District Court, S. D. New York.

Feb. 19, 1943.

Elbert N. Oakes, of New York City, for trustee of debtor.

John J. Bennett, Jr., Atty. Gen., for claimant.

Root, Clark, Buchner & Ballantine, of New York City, for Group of Institutions.

White & Case, of New York City, for Bankers Trust Co., as trustee.

Willkie. Owen, Otis, Farr & Gallagher, of New York City, for New York Trust Co., as trustee.

Flynt & Sully, of New York City, for creditor Westmoreland Coal Co.

HULBERT, District Judge.

This motion, made by the trustee of the debtor, brings on for consideration objections interposed by him, and a committee representing a group of institutional bondholders, Bankers Trust Company, as trustee under Debtor's Refunding 4% Gold Mortgage. and the New York Trust Company, as trustee under the Debtor's General 4% Gold Mortgage, to claims filed by the People of the State of New York:

(1) On or about August 15, 1941 for $22,877.28, with interest, and

(2) An amended claim filed March 11, 1942 for $425,796.72 with interest.

The facts have been stipulated. The amount involved is not disputed.

The issue is whether the State has a first and paramount tax lien or a priority only over general creditors.

Counsel for the Westmoreland Coal Company, one of a group of "six months creditors", while neither a party nor an intervenor, has also submitted a brief in support of the trustee's motion to sustain the objections filed.

The debtor, and its predecessors have, for about 74 years operated a railroad whose lines of communication now extend from the Port of New York (Weehawken, N. J.) to the Port of Oswego, New York, and Scranton, Pa.

The debtor's real estate, with improvements thereon, and certain of its other assets, are encumbered by a Refunding 4% Gold Mortgage, dated June 1, 1892, given to secure an issue of $20,000,000 principal amount of bonds outstanding and unpaid, and a General 4% Gold Mortgage, dated May 31, 1905, given to secure an issue of $12,000,000 principal amount of bonds outstanding and unpaid; said mortgages being recorded in each jurisdiction wherein any real estate or other property of the debtor covered by the lien thereof, is, or was, located.

The increase in the use of highways by motor vehicles and the increase in the number of highways due, to some extent, at least, to the development of the territory served by the New York, Ontario and Western Railway and other railroads, accentuated a condition of danger at grade crossing on the lines of railroads. This prompted the Governor of the State of New York to propose, and its Legislature authorized necessary legislation to enable the People of the State to vote upon amendments to its Constitution and authorize a bond issue of $300,000,000, in order to carry out a comprehensive and effective plan of grade crossing eliminations.

Since 1897 statutory provisions have existed in this State for such purpose but had not proved effective largely because the Legislature had failed to appropriate its share of the monies necessary to that end.

The State Constitution (Sec. 1 of Article VII and Sec. 9 of Article VIII) expressly prohibited the State from lending its credit to any individual, corporation, or association, until Section 14 was added to Article VII, effective Jan. 1, 1926, and since amended, effective Jan. 1, 1928. These amendments are set forth in a footnote [1] the portion of the last amendment being indicated by the words italicized.

---

[1] "Article VII, § 14.

"§ 14. The legislature may authorize by law the creation of a debt or debts of the state, not exceeding in the aggregate three hundred million dollars, to provide moneys for the elimination, under state supervision, of railroad crossings at grade within the state, at the expense of the state, railroad companies, *counties and* cities, *as hereinafter provided.* Of the expense of a grade crossing elimination to which any of the proceeds of such a debt are applied, *fifty* per centum shall be borne by the railroad company. *The remaining fifty percentum shall be borne by the state and the county in which the crossing is located, or by the state and the city in which it is located if the city contain two or more counties; except that. if so provided by law, such remaining fifty percentum of the expense of elimination of a grade crossing in any other city shall be borne by the state, the county and such city. The proportions of the expense of a grade crossing elimination to be borne by the state and county, state and city, or state, county and city, under the provisions of this section, shall be determined by or pursuant to law.* Laws shall be enacted to provide, so far as practicable, for repayment to the state of moneys advanced in aid of railroad companies, *counties and* cities, at such times, in such manner and with interest at such rate, that the state shall be able to pay when due the portion * * * so advanced, and interest thereon. The provisions of this ‘article, not inconsistent with this section, relating to the issuance of bonds for a debt or debts of the state and the maturity and payment thereof, shall apply to a state debt or debts created pursuant to this section; except that the law authorizing the contracting of such debt or debts shall take effect without submission to the people pursuant to section four of this article. *The aggregate amount of a state debt or debts which may be created pursuant to this section, as hereby amended, shall not exceed the difference between the amount of the debt or debts heretofore created or authorized by law, under the former provisions of this section, and the sum of three hundred million dollars; and the legislature, by law, may authorize or require a county to bear all or part of the portion of the expense of any such crossing elimination, heretofore begun or authorized, which was imposed by former provisions of this section on a city,* town or village therein.

"New section approved by the people at the general election held November 3, 1925, in effect Jan. 1, 1926. Amendment approved by the people at the general election held November 8, 1927, in effect Jan. 1, 1928."

As authorized by the first of said amendments to the Constitution, Chapter 233 of the Laws of 1926 provided the method by which such crossings at grade, as public safety required should be eliminated, would be determined upon; the cost to be borne, 25% by the State, 25% by the locality in which the improvement was made, and 50% by the railroad company. The proceeds of the authorized issue of State bonds were to be used, in the first instance, to pay the entire expense of the elimination, unless the railroad corporation should elect to pay directly its share out of its own funds. If any railroad having made such election, should thereafter fail to pay the proportion of expense of such elimination, the proceeds of such State bonds would then be used to that end. Provision was made for payments from time to time for work done, as partial accountings were had, on vouchers approved by the State Superintendent of Public Works, after audit by the State Comptroller, and upon warrants issued by him. Upon completion of the work of each grade crossing elimination, and the submission by the Public Service Commission of its report approving the same, the Comptroller was required to determine the number, amounts, and times of repayment to be made to the State by the railroad corporations, and others liable, "in such manner so far as practicable so that the state would be able to pay therewith when due the portion of the state debt, exclusive of that part properly chargeable to the state, incurred for such elimination and interest" and fix a time, not less than ten days thereafter, for a hearing. The Comptroller was directed, after such hearing, to make his final determination as to repayment and serve a written statement thereof upon the railroad corporation and others liable, and repayment was required of the amounts as therein prescribed.

The debtor had elected, in writing, to make such payments in 50 equal annual instalments. In the event of its failure so to do the Act provided: "the amount or amounts so due and payable shall be and become a first and paramount lien upon all real property of said railroad within the municipal corporation within which the work is done, and the same with interest thereon shall, upon written request of the comptroller, be assessed and levied upon the railroad property in said municipal corporation and collected in the same manner that taxes and assessments are collected by such municipal corporation. The municipal officer collecting such money shall forthwith turn over the same to the state treasury."

In accordance with the second amendment to Article VII of the Constitution, Chapter 678 of the Laws of 1928 effected certain changes in conformity therewith.

Subdivision 3 of Section 4 of that Act reads:

"In the event of the failure or refusal of the railroad corporation * * * or the successor * * * thereof, to pay the amount or amounts specified in such statement at the times therein prescribed, the amount or amounts so due and payable may be recovered as follows:

"The comptroller may certify the amount or amounts so due and payable to the board of supervisors of the county or counties in which the crossing is located, whereupon, it shall be the duty of such board of supervisors to apportion the amount or amounts so certified to the several towns and cities in such county according to the assessed valuation of the real property of such railroad corporation, or corporations or the successor or successors thereof in such respective towns and cities and to place the several amounts so apportioned on the respective assessment rolls of such towns and cities and to issue its warrant or warrants for the collection thereof. Thereupon it shall become the duty of such towns and cities through their proper officers to collect the respective several amounts so apportioned in the same manner as other taxes are collected in such towns and cities and when collected to pay the same to the county treasurer of such county who shall thereupon pay the same into the state treasury. *Any amount so levied shall thereupon become and be a first and paramount lien upon all real property of such railroad corporation or corporations or the successor or successors thereof within such respective towns and cities.*" (Italics mine.)

A considerable amount of grade crossing elimination work was under way when, on May 20, 1937, the debtor filed a voluntary petition for reorganization, pursuant to Section 77 of the National Bankruptcy Act, Title 11 U.S.C.A. § 205. The trustee appointed did not qualify until July 15, 1937. This delay was occasioned by the necessity of applying to and securing the approval of

the Interstate Commerce Commission. Title 11, Sec. 205 sub. c(1).

Meanwhile, by petition, verified June 22, 1937, the debtor sought permission to pay to the State instalments of principal, and interest, as they accrued, and an order was made on June 28, 1937, granting such authority. $14,224.94 had been repaid by the debtor, or the trustee of the debtor, when the question was raised by the mortgage indenture trustees as to whether the State was entitled to the payment of these instalments at the expense of the debtor's secured creditors and since that time the trustee has defaulted as to all such payments as they became due, and, by order dated June 25, 1941 he was directed "not to make payments of principal and interest on account of the forementioned claims of the State of New York until further order of this court."

It is the position of the objectors that the State did not have a valid lien before bankruptcy intervened, because there had been no default in the payments of instalments as they became due, and that it could not acquire a lien after the title to the debtor's property had vested in the trustee by the filing of the petition for reorganization.

In theory, at least, a bankrupt, to be relieved of the burden of his liabilities, surrenders, for the benefit of his creditors, all of his property (except certain statutory exemptions) which, subject to the encumbrances thereon, passes into the custody and control of the bankruptcy court. The purpose is to facilitate a disposition thereof as promptly as possible and effect a speedy liquidation.

The first provision "for the relief of debtors" was added to the Bankruptcy Act March 3, 1933, c. 204, Sec. 1, 47 Stat. 1467, known as Chapter 8[2].

Section 73(201) provided: "In addition to the jurisdiction exercised in voluntary and involuntary proceedings to adjudge persons bankrupt, courts of bankruptcy shall exercise original jurisdiction in proceedings for the relief of debtors, as provided in sections 202, 203, and 205 of this chapter."

Section 77 (205) contained subdivisions o and s.

On June 7, 1934, Sections 77A (206) and 77B (207) were added to the Bankruptcy Act. The former made applicable to the latter substantially the same provisions contained in Sec. 73 (201); Sec. 77B (207) also contains a subdivision o substantially the same as o in Section 77.

By amendment of August 27, 1935 subdivisions o and s of Section 77 (205) became l and n respectively.

The Chandler Act, June 22, 1938, c. 575, Sec. 1, 52 Stat. 895, incorporated certain sections of the Bankruptcy Act, Title 11 §§ 30, 31, 201, 202, 206 and 207, as Chapters X, XI, XII, XIII and XIV. Since no specific reference was made to Chapter VIII, it is contended by the objectors that, although the State asserts its priority for a first and paramount lien and payment thereof pursuant to Sections 64, sub. a, 67, sub. b and 67, sub. c, of the Bankruptcy Act, 11 U.S.C.A. §§ 104, sub. a and 107, subs. b, c, they are inapplicable to Chapter VIII.

■ I agree notwithstanding the language of subdivision (1). There is only one specific reference in Section 77 to the application of any provision of the straight bankruptcy provisions to railroad reorganization, to-wit: Section 60(96) (preferred claims). See opinion of Wilkerson, D. J., in Re Chicago, M. St. P. & Pac. R. Co., D.C., 27 F.Supp. 685, at page 687.

It is also significant that in the amendment of Section 53 (81), which imposes a duty on the Attorney General of the United States to collect and submit statistics to Congress, Chapters VIII and IX are there included with Chapters X, XI, XII and XIII.

In accordance with the "It-would-have-been-very-easy-to-say-so" rule (In re Columbia Tobacco Co., 2 Cir., 1941, 121 F.2d 641, 643), if Congress had intended Sections 64 and 67, and particularly subdivisions thereof relied upon by the State, to apply to a railroad reorganization, it could have said so.

Furthermore, the text of the statute itself indicates to me that it was the purpose and intention of Congress that railroad reorganization proceedings should be governed solely by the provisions of Sec-

---

[2] Chap. 8 contained Sec. 73, additional jurisdiction, now Title 11 U.S.C.A. § 201; Sec. 74—compositions and extensions, now 202; Sec. 75—agricultural compositions and extensions, now 203; Sec. 76—persons secondarily liable, now 204; Sec. 77—reorgan. of railroads, etc., now 205.

tion 77, except as otherwise specifically provided.

When a petition, filed in a railroad reorganization proceeding is approved: "the court in which such order is entered, shall, during the pendency of the proceedings under this section (77) and for the purposes thereof, have exclusive jurisdiction of the debtor and its property whenever located, and shall have and may exercise in addition to the powers conferred by this section all the powers, not inconsistent with this section, which a Federal Court would have had if it had appointed a receiver in equity of the property of the debtor for any purpose."

While subdivision i provides that the trustee appointed, or the debtor until then, shall be entitled forthwith to possession of and be vested with title to such property, such vesting is subject to any existing encumbrances (including liens) and it may be said that the trustee takes such title pendente lite, in view of the provisions of subdivision g, pursuant to which the trustee is divested of his title if no plan of reorganization is approved and the proceeding is dismissed.

Section 77 sub. c(7) provides the manner in which claims may be evidenced and allowed: "and for the purposes of the plan and its acceptance, after notice and hearing, the division of creditors and stockholders into classes according to the nature of their respective claims and interests. Such division shall not provide for separate classification unless there be substantial differences in priorities, claims or interests."

For a proper understanding of the nature of the State's claimed lien, it is necessary to set forth a factual statement.

The properties of the debtor affected by this present proceeding are within the counties of Oswego, Madison, Sullivan and Orange. This court lifted the omnibus stay against all creditors, issued when the original petition filed herein was approved, and this matter has been held in abeyance to enable the State to comply with the technical requirements on its part to be performed and come to an agreement with the objectors upon the agreed statement of facts.

The proofs of claim contain some 12 items or separate "causes of action."

Those contained in the proof of claim filed August 15, 1941, are not based upon an acceleration of payments, while those contained in the claim of March 15, 1942, are. That is the only substantial difference. The following is typical:

"Pursuant to the order of the Public Service Commission of the State of New York, made December 30, 1926, the elimination of seventeen grade crossings on the debtor's railroad in the City of Fulton, County of Oswego, were completed pursuant to the provisions of Chapter 233 of the Laws of 1926, which eliminations were carried out under and pursuant. to the orders of the Public Service Commission of the State of New York, known as cases numbers 3292 and 3387.

"An installment of principal on account of the debtor's share of the cost of the elimination, and interest thereon, in the sum of $13,035.30 became due and payable to the State of New York from the debtor for the year 1939.

"The debtor did default in the payment of the aforesaid sum of $13,035.30.

"On January 23, 1935 the Comptroller of the State of New York, pursuant to subdivision 3 of Section 4 of Chapter 678 of the Laws of 1928, as amended, certified to the Board of Supervisors of Oswego County that the debtor was in default in the payment of the installment of the principal and interest as aforesaid and pursuant to said certification the Board of Supervisors of Oswego County.

"At its annual meeting in December of 1939 did assess the real property of the debtor located in Oswego County, and made the following assessments and apportionment of the tax against the real property of the debtor located in the respective towns and cities and issued its warrants for the collection thereof:

\* \* \* \* \*

"No part of the said sum of $13,035.30 has been paid and there are no set-offs or counterclaims to the same and that no security is held by the State of New York for such debt.

Manifestly, the cost of each grade crossing elimination, and the share thereof to be borne and repaid to the State by the railroad company, could not be ascertained until the work was completed and the cost figures available and determination made by the Comptroller which was subject to review, and in several instances was actually reviewed, by the Appellate Division of the Supreme Court of the State of New York, and this bankruptcy proceeding

having meanwhile intervened, the State could not perfect its claimed lien without the permission of this court. An application for leave to do so and for payment was the proper remedy. In re Tyler, 149 U.S. 164, 184, 13 S.Ct. 785, 37 L.Ed. 689.

■ The franchise granted by the Legislature to the debtor, or its predecessor, to operate its railroad in this State was subject to such reasonable restrictions in the interest of public safety as the State might undertake to impose. Matter of Staten Island Rapid Transit R. Co. 220 App.Div. 80, 221 N.Y.S. 129, affirmed 245 N.Y. 643, 157 N.E. 892.

Such an exercise of the police power of the State was upheld by the U. S. Supreme Court in Erie Railroad Co. v. Board of Public Utility Commissioners, 254 U.S. 394, 410, 41 S.Ct. 169, 65 L.Ed. 322. The subject was reviewed at great length in the opinion in that case. See also Missouri, K. & T. R. R. Co. v. Oklahoma, 271 U.S. 303, 46 S.Ct. 517, 70 L.Ed. 957; Missouri Pac. R. Co. v. Omaha, 233 U.S. 121, 35 S.Ct. 82, 59 L.Ed. 157; and Denver & Rio Grande R. Co. v. Denver, 250 U.S. 241, 39 S.Ct. 450, 63 L.Ed. 958.

Central Savings Bank v. City of New York, 279 N.Y. 266, 18 N.E.2d 151, 121 A.L.R. 607, cited by the claimant is readily distinguishable.

That case concerned a statute which permitted the City of New York to order compliance with the Multiple Dwelling Act where old law tenement owners refused to make the repairs necessary in compliance with orders issued by the municipal authority. Such repairs were not for the benefit of the general public but for the owner and his tenants; moreover, the statute provided for no public hearing as to the determination of the amount of the necessary repairs, or even as to the necessity therefor, but directed the Board of Assessors to make the assessment on the mere certification of an employee of the Tenement House Department and gave the Board no discretion.

Panhandle Eastern Pipe Line Co. v. State Highway Commission of Kansas, 294 U.S. 613, 55 S.Ct. 563, 79 L.Ed. 1090, upon which the New York Court of Appeals in Central Savings Bank case, supra, placed substantial reliance, dealt with the right of the State Highway Commission to direct a Pipe Line Company to remove its pipe from the right of way of a proposed highway.

The U. S. Supreme Court clearly distinguished between the exercise of the police power under a grade crossing elimination statute and the provisions of the act sought to be enforced by the State Highway Commission.

■ The power of the State to create a lien stems from the prerogative right, at common law, which gave the British Crown priority over all subjects for the payment out of a debtor's property of all debts due it.

■ The first Constitution of the State of New York (adopted in 1777) provided that the common law of England, which, together with the statutes constituted the law of the Colony on April 19, 1775, should be and continue the law of the State, subject to such alterations as its Legislature might thereafter make. This provision has been embodied in substance in every Constitution of the State since, and by virtue thereof the People have succeeded to the Crown's prerogative right of priority. Matter of Carnegie Trust Co., 151 App.Div. 606, 136 N.Y.S. 466; Id., 206 N.Y. 390, 99 N.E. 1096, 46 L.R.A.,N.S., 260; Marshall v. New York, 254 U.S. 380, 41 S.Ct. 143, 65 L.Ed. 315.

In the exercise of its extraordinary powers with respect to bankruptcy legislation the Congress has provided that claims for personal injuries to employees of a railroad corporation arising under State or Federal laws (and other claims) shall be preferred against and paid out of the assets of such railroad corporation as operating expenses. Sec. 77, sub. n (205, sub. n).

The Laws of Arkansas afford a similar remedy providing an action is commenced within one year from the date the cause of action shall have accrued. Sections 11131, 11132, 11133 Pope's Digest of the Statutes of Ark. 1937; formerly Sections 8555, 8556, 8557 of Crawford & Moses Digest 1921.

In Re Missouri Pacific Railroad Co., 8 Cir., 113 F.2d 794, Evans the claimant, a citizen and resident of Pine Bluff, Arkansas, was run over by a train of the railroad company, in his home town, on Aug. 7, 1931 and sustained bodily injuries for which he instituted a suit on Sept. 10, 1931 in the Circuit Court of the City of St. Louis, Mo., and upon the trial thereof, Jan. 24, 1933, the jury rendered a verdict in his favor and a judgment was entered

thereon against the company. The judgment was affirmed by the Supreme Court of Missouri on Dec. 17, 1937 and rehearing was denied May 3, 1938.

Proceedings to reorganize the Missouri Pacific Railroad Company under Sec. 77 of the Bankruptcy Act were instituted more than a year after the injury occurred. Evans filed an amended proof of claim in that proceeding predicated upon the suit and judgment and claimed a lien under Section 11131 of the Arkansas statute. It was contended by the trustee of the debtor that the lien was merely inchoate on the date of bankruptcy and since it had not been perfected until after initiation of the proceedings under Section 77 the claimant did not have a valid lien. It was held, however, that it was a perfected lien as of the date of the injury.

■ In the case at bar, I hold that the right to a lien existed, if not from the time when the State became obligated to advance the cost of each grade crossing elimination improvement, certainly from the date when such advance was made, and since the trustee's default accelerated the payments which the debtor had elected to make and the State thereupon took the necessary steps to perfect its lien, it has a valid lien for the sum of $448,674.

The point is made by the objectors that since the railroad company was afforded the opportunity, at its election, to repay the advancements made by the State in 50 annual instalments, that the default in the payment of any instalment could only give the State a right to a lien to the extent of the amount of that instalment. This argument appears to be without merit. The obligation to reimburse the State became a liability when payments were advanced out of the bond issue and when the railroad company defaulted upon any one payment it breached the conditions of the agreement which permitted it to elect to pay the whole amount due in instalments.

It is further contended by the objectors that if this lien were given preference over the mortgage indentures, and the six months creditors' claims, it would be unconstitutional. This court will not pass on that question at this time.

A plan of reorganization was proposed by the debtor in January, 1939, but did not meet with the approval of the Interstate Commerce Commission. No further plan has been presented.

For many years before bankruptcy the debtor was a coal carrying railroad and the tonnage on its Scranton line was its principal source of revenue. In recent years, because of financial difficulties of the collieries, its coal tonnage has fallen off and the commercial tonnage, particularly on the Oswego line, has more than correspondingly increased, largely due to the shipment of materials essential to the conduct of the war.

What prospects the future holds for a reorganization is problematical. The total liability of the debtor for taxes is approximately $2,000,000. Negotiations are now in hand for the liquidation of this indebtedness upon the basis of substantial compromises and it seems probable that the net earnings for the current year will enable the trustee to consummate such negotiations.

If, however, the State's claim to a first and paramount lien should be denied and this proceeding results in a dismissal, the mortgagees would then be in a position to foreclose, and a purchaser at such sale would take over the railroad with grade crossing eliminations made at the State's expense without any repayment to the State therefor.

On the other hand, if a feasible and equitable plan of reorganization can be worked out, the court will be in a position to protect the interest of the State as well then as it could do now on any basis.

The motion to dismiss the two claims filed by the State is denied, and the claims are allowed as indicated, but the determination as to the priority of the State's lien will be reserved, without prejudice, for future consideration. Settle order on notice.