■ In the Matter of ISLAND PARK, LLC, Petitioner, v NEW YORK STATE DEPARTMENT OF TRANSPORTATION, Respondent, et al., Respondent. [876 NYS2d 203]—

Peters, J. Proceeding pursuant to CPLR article 78 (transferred to this Court by order of the Supreme Court, entered in Albany County) to review a determination of respondent Department of Transportation which closed and discontinued a private railroad crossing on a rail line owned by respondent CSX Transportation, Inc.

Petitioner operates a farm in the Town of East Greenbush, Rensselaer County, which is intersected by a set of railroad tracks owned by respondent CSX Transportation, Inc. and maintained by Amtrak. The tracks are part of the Hudson Line,

a heavily traveled railroad line that runs between New York City and the City of Rensselaer, Rensselaer County. Petitioner has an easement over a private at-grade crossing, known as Abele's Crossing, which it utilizes to move farm equipment across the tracks. According to petitioner's sole member and owner, Joseph Buono, Abele's Crossing has been used to move farm equipment across the tracks for decades.

In 2003, respondent Department of Transportation (hereinafter DOT) commissioned a study of railroad crossings from Rensselaer County to Dutchess County, including Abele's Crossing, seeking to improve public safety by consolidating or eliminating at-grade crossings whenever possible or, when any such crossings could not be closed, improving the crossing by implementing active warning devices and safety measures. In February 2005, the Commissioner of Transportation commenced a proceeding pursuant to Railroad Law § 97 to determine whether Abele's Crossing should be altered or closed and discontinued. A lengthy public hearing ensued, following which an Administrative Law Judge determined that Abele's Crossing "presents very real and serious safety concerns" and recommended that the crossing be closed and discontinued. An order was subsequently issued directing the closure and discontinuance of Abele's Crossing. Petitioner then commenced this CPLR article 78 proceeding seeking, among other things, annulment of DOT's closure order. Supreme Court transferred the proceeding to this Court (see CPLR 7804 [g]).

DOT possesses the authority to order alterations or the closure of existing private rail crossings, including farm crossings, "[i]n order to insure public safety" (Railroad Law § 97 [3]; see 17 NYCRR 919.4). If, as here, an agreement cannot be reached by the parties, the Commissioner is required to hold a hearing concerning the need for such alterations or closure and whether any alternatives are available (see Railroad Law § 97 [3]; 17 NYCRR 919.4). DOT's determination to close the crossing, having been made as the result of a hearing directed by law (see Railroad Law § 97 [3]), will be upheld if it is supported by substantial evidence in the record (see CPLR 7803 [4]; Matter of Long Is. R.R. Co. v Madison, 44 AD3d 1183, 1184-1185 [2007]; Matter of Long Is.-Airports Limousine Serv. Corp. v State of N.Y. Dept. of Transp., 170 AD2d 747, 749 [1991], appeal dismissed 77 NY2d 988 [1991], lv denied 78 NY2d 854 [1991]; Matter of Sutherland v Glennon, 221 AD2d 893, 894 [1995]).

Initially, petitioner seeks to annul DOT's determination to close Abele's Crossing on the ground that it was made in the

absence of objective standards to guide its determination.[1] Petitioner's argument is premised upon the Commissioner's failure to "prepare and promulgate standards and specifications for the design and protection of private rail crossings," which he is required to do pursuant to Railroad Law § 97 (4). Even assuming that the standards required by this provision were intended to govern decisions by DOT as to whether to close private rail crossings, as opposed to the construction or upgrading of crossings, "enactment of these regulations is not a condition precedent to DOT's authority to otherwise exercise its statutory duties in this area" (*Matter of Long Is. R.R. Co. v Madison*, 36 AD3d 1106, 1108 [2007]; *compare* Railroad Law § 97 [4] *with* Railroad Law § 97 [3]). Furthermore, there is no requirement that concrete rules or a precise formula be furnished in a field where, as here, "flexibility and the adaptation of the [legislative] policy to infinitely variable conditions constitute the essence of the program" (*Matter of City of Utica v Water Pollution Control Bd.*, 5 NY2d 164, 169 [1959] [internal quotation marks and citation omitted]; *see Waste Stream Mgt. v St. Lawrence County*, 156 AD2d 111, 115 [1990]). Rather, administrative discretion need only be "guided by an express or clearly implied standard, policy or purpose. Once a standard is established the courts cannot thereafter interfere with a reasonable determination within this sphere of discretion" (*Matter of Bologno v O'Connell*, 7 NY2d 155, 159 [1959] [citations omitted]; *see Matter of Big Apple Food Vendors' Assn. v Street Vendor Review Panel*, 90 NY2d 402, 408 [1997]; *Matter of Brooklyn Union Gas Co. v Public Serv. Commn. of State of N.Y.*, 34 AD2d 71, 72 [1970]). Here, we find that the "public safety" standard for ordering the alteration or closure of a private crossing pursuant to Railroad Law § 97 (3) "provides an adequate objective, intelligible standard for administrative action" (*Matter of Big Apple Food Vendors' Assn. v Street Vendor Review Panel*, 90 NY2d at 408; *see Dorst v Pataki*, 90 NY2d 696, 701 [1997]; *Waste Stream Mgt. v St. Lawrence County*, 156 AD2d at 115-116; *compare Matter of Nicholas v Kahn*, 47 NY2d 24, 33-34 [1979] [neither the legislature nor the administrative agency provided *any* standard for the exercise of authority]).[2]

Turning to the merits, we find substantial evidence support-

---

**1.** We note that petitioner neither challenges the constitutionality of Railroad Law § 97 nor argues that the procedures set forth therein deprived it of due process.

**2.** Indeed, the "public safety" standard has governed decisions by DOT (or the Public Service Commission prior to 1970) to require alterations or the elimination of railroad crossings for more than a century (*see e.g. Matter of Mayor of Yonkers*, 248 NY 593 [1928]; *Matter of Long Is. R.R. Co. v Madison*,

ing DOT's determination that public safety would be insured by the closure of Abele's Crossing. Extensive evidence was presented that the curve in the tracks to the south of the crossing creates a very limited sight distance, resulting in a significantly reduced time for a vehicle, upon first observing oncoming trains—which travel up to 110 miles per hour—to clear the tracks and safely traverse the crossing. Compounding the sight distance issue at Abele's Crossing is the steep grade of the approach to the tracks, impeding sight distance that is already compromised by the curvature in the tracks. Furthermore, the two sets of tracks at Abele's Crossing have a six-inch "superelevation" which, notably, is the highest level of superelevation in the country.[3] DOT witnesses testified that the "hump" in the crossing surface created by the superelevation makes it necessary for vehicles traversing the crossing to slow down which, when coupled with the steep approaches to the crossing, increases the time it takes to cross the tracks.

The evidence further demonstrated that the vehicles typically used by petitioner to traverse the crossing are slow moving, have low clearance from the ground and are exceptionally heavy. Additionally, some of the vehicles are 60 to 70 feet in length. According to DOT representatives, these characteristics were of significant concern because the superelevation and steep approach create a risk that low clearance vehicles will get hung up on the tracks and the heavy equipment could potentially crack the rail and cause a train to derail. Moreover, while there was no history of any accidents at Abele's Crossing, Buono did recount a few "near misses" between his farm equipment and trains in the crossing, and such testimony was confirmed by reports from CSX engineers.

Testimony was also presented that the aggregate effect of these conditions at Abele's Crossing rendered regular means of improving safety at crossings ineffective or cost prohibitive. While the steep slope of the approach could be corrected, DOT witnesses testified that the issues of limited sight distance and superelevation remained to create hazards for the slow-moving vehicles that petitioner used on the crossing. Paulo Villela, a civil engineer with the Grade Crossing Section of DOT, testified

44 AD3d 1183 [2007], *supra*; *Matter of East Seneca St. Grade Crossing in City of Oswego*, 244 App Div 664 [1935], *affd* 271 NY 567 [1936]; *Matter of Staten Is. R.T. Ry. Co.*, 220 App Div 80 [1927], *affd* 245 NY 643 [1927]; *Matter of New York Cent. & Hudson Riv. R.R. Co. [President & Trustees of Village of Ossining]*, 136 App Div 760 [1910], *mod* 200 NY 121 [1910]; *Matter of Boston & Albany R.R. Co.*, 64 App Div 257 [1901], *affd* 170 NY 619 [1902]).

**3.** Superelevation is where one set of tracks is higher than the other, in order to compensate for the centrifugal force acting on the trains.

that although it is generally possible to correct superelevated tracks, here it would require extensive alterations of approximately one mile of the tracks in either direction of the crossing. Testimony regarding other possible safety measures, such as locked gates, whistle posts, impenetrable barriers and use of flag persons, was also presented, but it was ultimately concluded that none of these measures would address the poor sight distance at the crossing because of the curvature of the tracks. DOT witnesses also testified that the use of standard active warning signs would not provide sufficient warning to cross certain slow-moving equipment, some of which took up to five minutes to transit the crossing. Moreover, the record reveals that other reasonable, safer points of access existed for petitioner to reach its fields on the other side of the tracks. Given the evidence of the hazardous configuration of Abele's Crossing, the absence of any remedial measure that would adequately address those dangers and the potentially catastrophic effects of a collision or derailment involving a high-speed passenger train, we conclude that DOT's concerns are real and legitimate and its determination to close the crossing is supported by substantial evidence.

Additionally, we reject petitioner's contention that DOT's determination lacks a rational basis given its decision not to close Teller's Crossing, a farm crossing located approximately one mile north of Abele's Crossing. As the Administrative Law Judge acknowledged, and the testimony of the DOT witnesses confirmed, each crossing must be evaluated according to the conditions that exist at that particular crossing. In any event, petitioner's assertion that the two crossings have "essentially the same features" is unsubstantiated by the record.[4]

Petitioner also contends that DOT violated the State Environmental Quality Review Act (ECL art 8 [hereinafter SEQRA]) because it failed to perform an environmental review before ordering the closure of Abele's Crossing. We disagree. 17 NYCRR 15.12 (g) exempts from the requirements of SEQRA "[a]ll ministerial acts" undertaken by DOT. Whether the issuance of the closure order here constitutes a ministerial act depends on "whether the underlying regulatory scheme invests the authorizing agency with discretion to act or refuse to act based on the type of information contained in an [environmental impact statement]" (*Matter of Ziemba v City of Troy*, 37 AD3d 68, 73-74 [2006], *lv denied* 8 NY3d 806 [2007]; *see Incorporated Vil. of Atl. Beach v Gavalas*, 81 NY2d 322, 326 [1993]).

---

4. The evidence revealed that Teller's Crossing is not intersected by superelevated tracks, has improved sight distance, and does not have as steep of an approach grade or train speeds as high as Abele's Crossing.

As previously stated, DOT initiated the action under Railroad Law § 97, which authorizes the Commissioner to require alterations to or the closure of private rail crossings "[i]n order to insure public safety" (Railroad Law § 97 [3]). While the Commissioner undoubtedly has certain discretion in this regard, that discretion is confined to consideration of the safety issues presented by the particular crossing at issue, and is unrelated to the environmental concerns that may be raised in an environmental impact statement (see Incorporated Vil. of Atl. Beach v Gavalas, 81 NY2d at 327; Matter of Ziemba v City of Troy, 37 AD3d at 75; see also Matter of Develop Don't Destroy [Brooklyn] v Urban Dev. Corp., 59 AD3d 312, 316 [2009]). As such, "preparation of an [environmental impact statement] would be a meaningless and futile act" because the Commissioner is "vested with discretion in only a limited area" and could not, upon finding that the public safety could only be insured by closing a crossing, refuse to order such closure "on the basis of SEQRA's broader environmental concerns" (Incorporated Vil. of Atl. Beach v Gavalas, 81 NY2d at 327). Thus, the issuance of the closure order was a ministerial act exempt from the requirements of SEQRA (see id. at 327-328; Matter of Ziemba v City of Troy, 37 AD3d at 76).[5] For this reason, petitioner's segmentation argument must also fail (see ECL 8-0105 [5] [ii]).

Similarly unavailing is petitioner's assertion that the closure order is defective because DOT failed to take steps to acquire its property interest in Abele's Crossing prior to ordering the closure of the crossing. Railroad Law § 97 (5) vests in the Commissioner the power to acquire "any real property, easements, rights-of-way or similar rights necessary for the purposes of this article." While it is true that petitioner possesses a cognizable property interest in the crossing, nothing in Railroad Law § 97 (5) requires the Commissioner to exercise his power to acquire petitioner's property interest prior to issuing the closure order, and the failure to do so does not render the order invalid (see Matter of City of Buffalo, 245 App Div 19, 21 [1935]).

Petitioner's remaining contentions, to the extent not addressed herein, have been fully considered and found to be unavailing.

---

5. Our conclusion is further supported by the fact that the "[i]ssuance of grade crossing elimination orders . . . pursuant to . . . Transportation Law [§ 222]"—which differ from the closure order issued here pursuant to Railroad Law § 97 only in that they pertain to highway, rather than private, crossings—are specifically exempt from SEQRA review as a ministerial act (17 NYCRR 15.13 [c]).

Mercure, J.P., Kane, Malone Jr. and Stein, JJ., concur. Adjudged that the determination is confirmed, without costs, and petition dismissed.